

CLERK, U.S. DISTRICT COURT
RECEIVED
FEB 13 2004
EASTERN DISTRICT OF TEXAS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MAR 0 4 2004
DAVID J. MALAND, CLERK
BY
DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. HAROLD E. (GENE) WRIGHT | § § § § | FOURTH AMENDED<br>ORIGINAL COMPLAINT |
| vs. | § § § | |
| CHEVRON USA, INC.<br>CHEVRON CORPORATION<br>AMOCO CORPORATION<br>ANDARKO PETROLEUM<br>    CORPORATION<br>ATLANTIC RICHFIELD COMPANY<br>BP AMOCO CORP.<br>BP EXPLORATION & OIL, INC.<br>CNG PRODUCING COMPANY<br>CONOCO, INC.<br>DEVON ENERGY CORPORATION<br>DYNEGY, INC.<br>ELF EXPLORATION, INC.<br>EXXON COMPANY, U.S.A.<br>EXXON CORPORATION<br>FINA OIL & CHEMICAL CO.<br>KERR-MCGEE CORPORATION<br>KERR-MCGEE OIL & GAS CORP.<br>MARATHON OIL COMPANY<br>MOBIL CORPORATION<br>MOBIL EXPLORATION &<br>    PRODUCING U.S., INC.<br>MOBIL OIL EXPLORATION &<br>    PRODUCING SOUTHEAST, INC.<br>MOBIL CALIFORNIA EXPLORATION<br>MOBIL CALIFORNIA EXPLORATION<br> AND PRODUCING ASSET COMPANY<br>MOBIL OIL CORPORATION<br>MOBIL PRODUCING TEXAS AND<br>    NEW MEXICO<br>NORCEN EXPLORER, INC.<br>OCCIDENTAL PETROLEM<br>    CORPORATION<br>OCCIDENTAL OIL AND GAS<br>    CORPORATION | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 5:03CV264<br>(originally filed in the United States<br>District Court for the Eastern District<br>of Texas, Texarkana Division on<br>August 2, 1996 as Civil Action No.<br>C-596CV243)<br><br>JUDGE DAVID FOLSOM<br><br><br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

```
ORYX ENERGY COMPANY                       §
OXY USA, INC.                             §
PHILLIPS PETROLEUM COMPANY                §
SHELL OIL COMPANY                         §
SHELL OFFSHORE, INC.                      §
SHELL FRONTIER OIL AND GAS                §
SHELL WESTERN EXPLORATION                 §
    AND PRODUCTION COMPANY                §
SHELL DEEPWATER PRODUCTION, INC.          §
SHELL WESTERN EXPLORATION AND             §
    PRODUCTION, INC                       §
TEXACO, INC.                              §
TEXACO EXPLORATION AND                    §
    PRODUCTION                            §
TOTAL FINA S.A.                           §
TOTAL MINATOME CORPORATION                §
TOTAL EXPLORATION PRODUCTION              §
    USA, INC.                             §
UNION OIL COMPANY OF CALIFORNIA           §
UNION PACIFIC RESOURCES GROUP, INC.       §
VASTAR RESOURCES, INC..                   §
                                          §
DEFENDANTS                                §
```

---

## FOURTH AMENDED ORIGINAL COMPLAINT

---

Relator Harrold E. (Gene) ("Wright") brings this action on behalf of the United States of America and on his own behalf, and alleges as follows:

## I.
## INTRODUCTION

1.     The claims asserted here are for violations of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* for underpayments and non-payments of royalties and other amounts owed for natural gas ("gas"), natural gas liquids ("NGL") and condensate (except reported lease condensate) produced from the Outer Continental Shelf ("OCS"), onshore federal lands, and lands owned by or for the benefit of Indian tribes and individual Indian allottees. These claims

are for many separate and distinct, but often coordinated, fraudulent schemes and "skimming" devices by the largest energy companies in the world (including companies owned or controlled by the Governments of Italy, France, Belgium, Holland and Great Britain) to defraud and cheat (1) the United States Treasury, (2) the Land and Water Conservation Fund, (3) the National Historic Preservation Fund, (4) the U.S. Reclamation Fund, (5) the educational and other agencies, funds and subdivisions of all 50 states, (6) more than 25 different Native American Indian Nations and Tribes, and (7) hundreds of thousands of individual Indian allottees. Many of these fraudulent schemes and devices have been designed specifically to cheat and "game" the system of federal collection of royalties owed on federal and Indian lands.

2. This action was filed by Wright in this Court on August 2, 1996 under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et. seq.* ("FCA"). The original complaint filed in 1996 addressed both oil and gas royalty underpayments. While still under seal, this action was transferred to the Lufkin Division where the gas claims were severed from the oil claims. The oil claims were ultimately resolved by settlement in *Johnson v. Shell*, Cause No. 9:96 CV66 in the United States District Court for the Eastern District of Texas for settlements in excess of $450 million. On March 28, 2000, the United States of America joined in this action as to the three following groups of affiliated Defendants: (i) the "Mobil Group" of affiliated Defendants — Mobil Oil Corporation, Mobil Oil Exploration and Production, Mobil Oil Exploration & Producing North America, Inc., Mobil Producing Texas & New Mexico, Inc., and Mobil Oil Exploration and Producing Southeast, Inc.; (ii) the "Meridian/Burlington Group" of affiliated Defendants — Meridian Oil, Inc. and Meridian Oil Production, Inc; and (iii) the "Shell Group" of affiliated Defendants — Shell Oil Company, Shell Consolidated Energy Resources,

Inc., Shell Frontier Oil & Gas, Inc., Shell Gas Pipeline Company, Shell Land & Energy Company, Shell Offshore, Inc., Shell Pipeline Corporation and Shell Western E&P Inc.

3. The United States of America filed a Complaint against the Mobil and Burlington Defendants on May 31, 2000, and later filed a Complaint against the Shell Defendants. The Shell Defendants have settled certain of the claims asserted against them for $56 million, generally certain claims as to offshore production for the period ending December 31, 1999, but none of the claims as to offshore production after such date or any onshore or conspiracy claims.

4. This action was transferred from this Division to the Lufkin Division, and then later transferred by the MDL Panel to the District of Wyoming where it remained for more than three years. During this period that court dismissed, under the "first-to-file" provision of the FCA, all of the other, later-filed FCA actions which conflicted or overlapped with this action. Recently this action was remanded by the MDL Panel from the District of Wyoming to the Eastern District of Texas and assigned back to this Court.

5. In this action Wright seeks recovery of damages and civil penalties under the FCA on behalf of the United States of America arising from false and fraudulent statements or records made or used, or caused to be made or used, to conceal, decrease or avoid obligations to pay or transmit royalties in money or kind on natural gas, NGL and condensate produced by Defendants and others from federal and Indian lands. These false statements and false royalty payments violated 31 U.S.C. § 3729(a)(7). Wright also seeks to recover for the federal government herein damages and civil penalties under the FCA for various conspiracies to defraud that violated 31 U.S.C. § 3729(a)(2).

## II.
## PARTIES

6.      Relator/Plaintiff Wright resides in Tyler, Smith County, Texas in the Eastern District of Texas. He has a background of more than 50 years in the oil and gas industry. He has been engaged in the production, marketing and sale of gas and NGLs for fifty years. During his career, he has been an employee, an officer and an owner of independent gas/NGL production companies. Throughout his professional life, Relator Wright has been involved in matters related to the pricing of gas and NGLs, and the calculation of royalty payments, and has gained experience and knowledge of defendants' improper royalty valuation practices. Wright gained all his knowledge and information directly, by himself without interruption, and through his own efforts. He gained all his knowledge and information independently of any public disclosure. Wright adopts by reference, pursuant to Fed. R. Civ. P. 10(c), and incorporates herein by reference *in toto,* all statements contained in his sworn Declaration, attached to his response on file in this case to the defendants' motions to dismiss. He respectfully refers the Court to the detailed facts stated therein that establish that he had direct and independent knowledge of the information that formed the basis of any allegations or transactions in any public disclosure now or hereafter claimed by defendants.

**a.      The Chevron Defendants – Chevron USA Inc., Chevron Corporation and Dynegy, Inc.**

7.      Defendant Chevron U.S.A. Inc., a wholly owned subsidiary of Defendant Chevron Corporation, has been the nation's leading producer of OCS gas and the largest producer from federal leases, accounting for over 11% of federal production. Prior to 1996 most of Chevron U.S.A., Inc.'s gas and NGL marketing operations were handled by its subsidiaries and divisions Warren Petroleum Company (NGL) and the Natural Gas Business Unit (gas), all of

5

whose profits accrued to Chevron U.S.A., Inc. After 1996, Chevron U.S.A., Inc.'s gas and NGL marketing functions were handled by Dynegy, Inc., a controlled partly-owned affiliate, under non-arms length arrangements and transactions whereby substantial portions of the proceeds of gas/NGL production accrued to Chevron U.S.A., Inc. Chevron U.S.A., Inc. is a Pennsylvania corporation. Chevron Corporation, Chevron U.S.A., Inc., Warren Petroleum Company and the Natural Gas Business Unit are sometimes referred to herein as ("Chevron.") Chevron Corporation and Texaco, Inc. have merged.

      **b.**      **Defendant Anadarko Production Company**

8.      Defendant Anadarko Petroleum Corporation ("Anadarko") is a Delaware corporation that has substantial production on both OCS and federal/Indian onshore leases. Much of its production is marketed through Anadarko's wholly-owned subsidiary Anadarko Energy Services Company, and the proceeds of such production have been accrued to Anadarko.

      **c.**      **The BP Amoco Defendants – BP Amoco Corp., Amoco Production Company and BP Exploration and Oil, Inc.**

9.      Defendant BP Amoco Corp. (formerly Amoco Corp.) and its subsidiaries Amoco Production Company and BP Exploration & Oil, Inc. (collectively "BP Amoco") are among the largest gas producers in the United States. They hold substantial numbers of federal/Indian leases in New Mexico, Colorado, Wyoming, other states and on the OCS, which during the period 1995-1999 accounted for over 7% of federal gas production. BP Amoco Corp. is an Indiana corporation; Amoco Production Company is a Delaware corporation; and BP Oil & Exploration, Inc., is an Ohio corporation. BP Amoco gas and liquids production has been marketed through its affiliate Amoco Energy Trading Corporation, and that production and the proceeds of such production have been accrued to BP Amoco.

6

### d. Defendant CNG Producing Company.

10.     CNG Producing Company is a wholly owned subsidiary of Dominion Resources, Inc. (formerly Consolidated Natural Gas. Co.) ("Dominion").  Much if not all of CNG Producing Company's gas production is transferred to and/or converted to electricity by other wholly owned utility subsidiaries of Dominion, and sold to end users.  All of the production and proceeds of such production received by such affiliates from such end users accrue to CNG Producing Company as a wholly owned subsidiary of Dominion with whom its income is consolidated along with the income of the subsidiaries selling to end users.  CNG Producing Company has changed its name to Dominion Exploration and Production, Inc.  It is a Delaware corporation.

### e. Defendant Conoco, Inc.

11.     From 1981 until October 1998, Defendant Conoco, Inc. was a wholly owned subsidiary of E.I. Dupont de Nemours and Company.  Much of the gas and NGL production of Conoco, Inc. was used by the parent as feedstock for its petrochemical operations and used in the manufacture of petrochemical products.  The proceeds of such production and products accrued to Conoco, Inc. because its income was consolidated with that of its parent for financial accounting and public and governmental reporting purposes.  Conoco, Inc. and Phillips Petroleum Company have merged into ConocoPhillips, Inc. ("ConocoPhillips").  ConocoPhillips owns substantial OCS leases and onshore federal and Indian leases.  A substantial portion of the ConocoPhillips production of gas and NGL is used, or exchanged for other substances used, in the petrochemical plants formerly owned by Phillips Petroleum Company as feedstock for the manufacture of downstream products.  Such production and downstream products and the gross proceeds thereof accrue to ConocoPhillips as federal lessee.

7

**f.**     **Defendant Devon Energy Corporation**

12.     In August 1999, PennzEnergy (formerly Pennzoil Company) merged into Devon Energy Corporation ("Devon"), and the resulting entity is one of the largest U.S. independent producers of oil and gas. Some of its gas production has been marketed by an affiliated entity, PennUnion Energy Service, L.L.C., and such production and the proceeds thereof have accrued to Devon as federal lessee.  Devon is a Nevada corporation.

**g.**     **The Exxon Defendants – Exxon Corporation and Exxon Company, U.S.A.**

13.     Defendant Exxon Corporation and its Exxon Company, U.S.A. division (collectively "Exxon") is a major producer of gas and NGL from OCS and federal onshore leases. Defendant Exxon Corporation, a New Jersey corporation and defendant Mobil Corporation, a New York corporation, have merged into ExxonMobil Corporation, a New Jersey corporation.

**h.**     **The Kerr-McGee Defendants**

14.     Kerr-McGee Corporation and its subsidiary Kerr-McGee Oil & Gas Corporation (collectively "Kerr-McGee") is a substantial producer of gas and NGL from OCS and onshore federal and Indian lands.  These account for about 50% of Kerr-McGee's total gas and NGL production.  Kerr-McGee has marketed gas through its affiliate Kerr-McGee Natural Gas, Inc. and two other affiliates, and all of such production and the proceeds thereof has accrued to Kerr-McGee. Both Kerr-McGee Corporation and Kerr-McGee Oil & Gas Corporation are Delaware corporations.

**i.**     **The Mobil Defendants**

15.     Defendant Mobil Corporation's wholly owned subsidiaries have held substantial OCS and onshore federal and Indian leases.  They are Defendants Mobil Exploration &

8

Producing U.S. Inc., Mobil Oil Exploration and Production Southeast, Inc., Mobil California Exploration and Producing Asset Co., Mobil Oil Corp., and Mobil Producing Texas & New Mexico. Mobil Corp. and its subsidiaries are collectively referred to as "Mobil." Mobil Corp. and Exxon Corporation have merged into ExxonMobil Corporation, Inc., a New Jersey corporation.

### j.    **Defendant Oryx Energy Company**

16.    Defendant Oryx Energy Company, a Delaware corporation ("Oryx"), has been a substantial producer of OCS gas and NGL. Oryx has conducted business in the United States through Sun Energy Partner, L.P. Oryx has served as managing partner of Sun Energy Partners, L.P. and was and is named here both in its corporate capacity and as general partner of Sun Energy Partners, L.P. In 1995, in a non-arms'-length transaction, wholly owned subsidiaries of Apache Corporation and Oryx formed a marketing subsidiary, ProEnergy, to market the gas production of both indirect owners. ProEnergy's ownership interests vary according to the percentage of gas sales attributable to the gas production of each owner. The portion of such production and the proceeds thereof received by ProEnergy allocable to Oryx and its production accrue to Oryx as a federal lessee.

### k.    **The Oxy Defendants**

17.    Defendant Occidental Petroleum Corporation ("Occidental") has conducted its gas and NGL production business through two wholly-owned subsidiaries, defendant Occidental Oil and Gas Corporation and defendant OXY USA, Inc. and now operates such business as Spirit 76 (all collectively "Oxy"). Oxy has been among the top 20 producers of OCS gas. OXY USA, Inc. is a Delaware corporation and Occidental Oil and Gas Corporation is a Texas corporation.

**l.  Defendant Phillips Petroleum Company**

18.     Defendant Phillips Company ("Phillips") is a substantial producer of gas and NGL from OCS and federal onshore leases. Phillips has marketed its gas production through its wholly owned subsidiaries Phillips Gas Company and GPM Gas Corporation, and the production and proceeds of production transferred to such subsidiaries have accrued to Phillips for all purposes. Much of the gas and NGL production of Phillips was used, or exchanged for other substances used, by Phillips as feedstock in its large petrochemical operations, and to manufacture downstream products, all of which feedstock and products and the proceeds thereof have accrued to Phillips as a federal lessee. Phillips and Conoco have merged into ConocoPhillips, Inc.

**m.  The Shell Defendants**

19.     Defendant Shell Oil Company ("Shell Oil") is a subsidiary of Shell Petroleum, Inc. which is jointly owned by Dutch and British interests. Shell Oil owns a number of subsidiary corporations engaged in the production and marketing of gas and NGL. These include defendants Shell Offshore, Inc., Shell Deepwater Production, Inc., Shell Exploration and Production Company, Shell Frontier Oil and Gas, Inc., and Shell Western E&P, Inc. (referred to collectively as Shell"). In 1995 Shell Oil and Tejas Gas Corporation ("Tejas") formed a natural gas marketing company named Tcoral Energy, L.P. ("Coral"). In 1996 Coral purchased substantially all of Shell's natural gas production. More than half of such production was then sold to Shell Chemical Company and used, or exchanged for other substances used, as feedstock for the manufacture of petrochemical products. All such products and the proceeds thereof accrued to Shell as federal lessee. In 1999 Shell entered into non-arms'-length transactions with an affiliate, Enterprise Products Partners, L.P. ("EPP"),  relating to Shell's mid-stream assets in

10

the Gulf Coast that have operated to defraud the Government of royalties on gas and NGL, and by which EPP and Shell have conspired to defraud the Government. All the Shell defendants are Delaware corporations.

> **n.**    **The Texaco Defendants**

20.    Defendants Texaco, Inc. and its subsidiary Texaco Exploration and Production, Inc. (collectively "Texaco") are Delaware corporations. Texaco has been a leading producer of OCS and onshore federal gas and NGL, having been the third largest producer from federal lands from 1995 to 1999. Texaco has marketed its gas and NGL through Texaco Gas Marketing, Inc. and other subsidiaries. The production acquired by such subsidiaries and the proceeds of the sale of such production by these consolidated subsidiaries have accrued to Texaco as a federal lessee by virtue of its consolidated earnings statements. Texaco, Inc. and Chevron Corporation have merged into ChevronTexaco, Inc.

> **o.**    **The Total Fina Defendants**

21.    Defendant Total Fina S.A., through its wholly owned direct and indirect subsidiaries, Defendants Total Oil and Chemical Company, Total Minatome Corporation, Total Exploration Production U.S.A., Inc., and Elf Exploration, Inc. (collectively "Total Fina"), produces gas and NGL from OCS leases. Total Fina operates the world's largest polystyrene plant and large polypropylene and polyethylene plants that consume gas and NGL produced by Total Fina from federal lands. The production of such gas and NGL and the proceeds thereof consisting of the products manufactured and sold from such plants, and the proceeds of such sales, accrue to Total Fina as federal lessee by virtue of its consolidated financial statements. All of the Total Fina S.A. subsidiary defendants are Delaware corporations. Total Fina S.A. was a

corporation organized under the laws of France. It has merged with TotalFinaElf, a corporation organized under the laws of France.

### p.  Defendant Union Pacific Resources Group, Inc. and Norcen Explorer, Inc.

22.  Defendant Union Pacific Resources Group, Inc. ("UPRG") was created in the mid-1990s when a number of wholly owned subsidiaries of Union Pacific Corporation were joined together and divested by the parent corporation. In 1998 UPRG acquired Norcen Explorer, Inc. UPRC is one of the largest independent producers of oil and gas in the United States. It is a Utah corporation. Norcen Explorer, Inc. is a Delaware corporation.

### q.  Defendants Vastar Resources, Inc. and Atlantic Richfield Co.

23.  Defendant Vastar Resources, Inc. ("Vastar") was created in 1993 as a wholly owned subsidiary of Atlantic Richfield Co., a Delaware corporation ("ARCO"). At all times since then ARCO has owned at least 81% of the stock of Vastar. Upon forming Vastar, ARCO contributed to it the vast majority of ARCO's U.S. gas producing properties (excluding Alaska). As a result, Vastar has produced nearly one billion cubic feet of gas per day, roughly 40% of which has come from OCS leases. Vastar has marketed its gas through a subsidiary, Vastar Gas Marketing, Inc. ARCO has merged into BP Amoco.

24.  All defendants have been served, have appeared, and have filed motions to dismiss this action.

## III.
## JURISDICTION

25.  This action is brought under the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA") to recover treble damages, civil penalties, costs of suit, including reasonable attorneys' fees and expenses, and to obtain ancillary relief. Wright is authorized to bring this action and the

claims described below on behalf of the United States pursuant to 31 U.S.C. §§ 3730(b) and 3730(e)(4) and has satisfied all conditions precedent to his participation as a Relator. Pursuant to 31 U.S.C. § 3730(e)(4)(A), the allegations contained herein have not been publicly disclosed as defined by the FCA, or alternatively, Wright qualifies as an original source within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B). Pursuant to Section 3730(e)(4)(B) of the FCA, Wright has provided in writing to the Attorney General of the United States, prior to the filing of this and prior complaints, substantially all information on which the allegations are based. Pursuant to 31 U.S.C. § 3730(b)(2), Wright has served the United States of America prior to filing this complaint. This Court has jurisdiction over this action under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345 because this civil action arises under the laws of the United States.

## IV.
## VENUE

26. Venue is proper in the Eastern District of Texas under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because one or more of the Defendants can be found, resides, or transacts business, in the Eastern District of Texas, and because one or more of the acts proscribed by 31 U.S.C. § 3729 occurred in the District.

## V.
## FACTS

27. More than one-third (1/3) of the nation's gas production comes from federal and Indian lands. As much as 80% of this federal production has come from OCS waters. Thus, OCS gas production accounts for some 25% of the nation's total gas production. Nearly all OCS production comes from offshore Louisiana and Texas.

28. Defendants are lessees, interest owners and operators under oil and gas leases of OCS lands, federal onshore lands, and lands and mineral interests held by the federal

government in trust for Indian tribes and individual Indian allottees (collectively "federal lands").

29.  As such, Defendants are legally obligated under the terms of their leases, and the applicable federal statutes and regulations, to account for and pay to the United States Government (the "government") the percentage royalties specified in the leases on oil, lease condensate, natural gas, natural gas liquids ("NGL"), and downstream condensate.

30.  There are different sections of government regulations for valuation of oil royalties and for valuation of gas royalties.  Under these regulations "lease condensate" (recovered at the leases) is treated as "oil," and "downstream condensate" (recovered downstream of the production measurement points) is treated as "gas."

31.  There long have been standard government forms for OCS leases, and different standard forms for onshore federal leases.  The standard forms for both have been changed, mostly in minor respects, from time to time over the years.  Prior to the Indian Mineral Development Act of 1982, most Indian leases were on a DIA Standard Lease Form 157.

32.  Although there are exceptions, OCS leases generally provide for a 1/6[th] royalty on all production; onshore federal leases generally provide for a 1/8[th] royalty on all production; and Indian leases provide varying royalties, sometimes in the 20%-25% range.  As shown below, all OCS leases issued after a certain date require royalties to be computed on the basis of **the <u>higher</u> of "gross proceeds" or "fair market value."**

33.  The federal lease forms do not themselves provide a comprehensive definition of the attributes of "royalty."  However, consistent and universally accepted judicial and administrative decisions define the oil and gas royalty interest as an interest in oil and gas that is

free of all costs of "production" (as well as all costs of drilling, completing and equipping the wells).

34.     Furthermore, the controlling federal statutes provide partial definitions of "royalty" by specifically defining  "production" as including transportation from the leases. These controlling statutory definitions of production are consistent with the OCS lease terms and have the legal effect of freeing all federal royalty from any costs of transportation from the leases.

35.     The regulations applicable to a majority of producing OCS leases do not allow any deductions for transportation costs.  These regulations are in this respect consistent with both the OCS lease terms and the controlling statutes.  The current regulations that apply only to the smaller percentage of currently producing OCS leases issued after the regulation effective date of March 1, 1988 purport to provide, inconsistently with the statutes and lease provisions, certain allowances for transportation costs; but these regulations also provide that in the event of inconsistencies, the lease or statutory provisions control.

36.     The government royalty valuation regulations allow deductions from royalty of certain specified costs of processing gas as "post-production" costs rather than production costs. These regulations are not inconsistent with the provisions of many federal onshore leases and may be effective as to them.

37.     However, because the controlling OCS lease provisions require royalty to be computed at not less than "gross proceeds," and because "gross" by definition means "without deductions" the subordinate regulations are inconsistent with the controlling OCS leases and are ineffective as to processing deductions.   The current regulations themselves expressly

contemplate inconsistencies and provide that to the extent of any inconsistency between the lease terms and the regulations, the lease terms control.

38. Many federal onshore leases do not contain the "gross proceeds" requirement; and as to them the subordinate regulations allowing deductions for processing costs are not inconsistent and can be applied.

39. The 1978 amendments to OCSLA provided a statutory definition of "fair market value." This controls determination of this prong of the two-prong royalty valuation requirement for all OCS leases issued thereafter, which require, as shown below, that royalty be computed on the *higher* of either "gross proceeds" or "fair market value." That definition is as follows:

> "(o) The term 'fair market value' means the value of any mineral (1) **computed at a unit price equivalent to the average unit price at which such mineral was sold pursuant to a lease during the period for which any royalty or net profit share is accrued or reserved to the United States pursuant to such lease,** or (2) if there were not such sales, or if the Secretary finds that there were an insufficient number of such sales to equitably determine such value, **at the average price at which such mineral was sold pursuant to other leases in the same region of the Outer Continental Shelf during such period,** or (3) if the Secretary finds that there are insufficient number of such sales to equitably determine such value, at an appropriate price determined by the Secretary."

43 U.S.C. § 1331(o) (emphasis added).

40. No definition of "gross proceeds" was included in these 1978 amendments, and none is contained in 1982 FOGRMA. But "gross," both by standard dictionary definition and by consistent judicial definitions, consistently has been defined as meaning "without any deductions." Despite the fact that all Defendants have known that "gross" means "without any deductions," all Defendants consistently have taken deductions from their OCS royalty payments for both transportation costs and processing costs – the latter only in those instances where they have admitted that their gas has been processed.

16

41.     The above quoted and controlling statutory definition of "fair market value" provides only a <u>floor</u> for the computation of OCS royalty payments under leases requiring that royalty be calculated on the basis of the **higher** of "fair market value" or "gross proceeds."

42.     By virtue of this statute, the price at which any mineral (oil, condensate, gas, or NGL) was sold pursuant to an OCS lease during the period involved – whether by the Defendant lease owner, any affiliate of such Defendant, or any other interest owner in the lease or any affiliate of such interest owner – to any independent third party must be included in the calculation of "the average unit price at which such mineral was sold pursuant to [such] lease."

43.     This statute, both by law and by specific provision in the current MMS royalty valuation regulations, controls over any inconsistent administrative regulation.  Because this statute requires the calculation of an "average unit price" for OCS production, if there is more than one owner of an OCS lease, and any production of the different owners is sold at different prices during the same period of time, the owner(s) whose production has been sold at prices lower than the average of such prices cannot possibly have complied with his obligations either under OCSLA or the OCSLA leases which, as shown below, are made expressly subject to OCSLA.

### Some Controlling OCS Lease Provisions

44.     The more recent standard OCS leases  provide in Section 6(b): "Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, **the value of production for purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof."** (emphasis added).  Because the government as Lessor has **never** determined **not** to **consider** pricing relief from  otherwise  applicable  Federal  regulatory

requirements, the value of production for purposes of computing royalty from these OCS leases can **never** be **"less than the gross proceeds accruing to the Lessee from the sale thereof."**

45.     These OCS leases also provide in the first sentence of Section 6(b): "The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production."

46.     The clear and unavoidable effect of these two controlling OCS lease provisions, requiring both that the value of production for royalty purposes shall never be less than "gross proceeds," **and** also that such value shall never be less than "market value," is to require the payment of royalty **always** computed on the basis of the **higher** of "gross proceeds" or "market value." Defendants have not done this.

47.     Section 1 of the standard form of OCS lease adopted in February 1971 (Form 3300-1) provides as follows:

> "Sec. 1. Statutes and Regulations.  This lease is made pursuant to the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C. Secs. 1331 *et seq.*) (hereinafter called the Act).  **This lease is subject to the Act and to all the terms, conditions and requirements of the valid regulations promulgated by the Secretary of the Interior** (hereafter called the Secretary) **thereunder <u>in existence upon the effective date of this lease,</u>** all of which are incorporated herein and, by reference, made a part hereof.  **This lease shall also be subject to regulations <u>hereafter issued by the Secretary pursuant to his authority under Section 5(a)(1) of the Act</u>** to prescribe and amend at any time such rules and regulations as he may determine to be necessary and proper **<u>in order to provide for the prevention of waste and for the conservation of the natural resources of the Outer Continental Shelf, and for the protection of correlative rights therein,</u>** which regulations shall be deemed incorporated herein and, by reference, made a part hereof when promulgated."  (emphasis added)

48.     Thus, the only applicable regulations issued **after** the effective date of these OCS leases are those related to **prevention of waste** (*e.g.*, overproduction or other wasteful practices) and the **conservation** of OCS natural resources (e.g., requiring proper reservoir maintenance)

and the protection of **correlative rights** (*i.e.,* against drainage by lessees of adjoining tracts). The regulations dealing with the calculation of royalty payments have nothing to do with any of such subjects. Consequently, only those royalty valuation regulations "in existence upon the Effective Date" of these OCS leases apply to computation of royalties under such leases.

49.     The subjects of "waste," "conservation" and "correlative rights" have clearly understood meanings in the legal history of the oil and gas industry, evidenced by scores of judicial decisions, including a number by the Supreme Court of the United States. Defendants have known the computation of royalty payments is not included within any of those subjects.[1] Therefore, Defendants have known that they were subject only to those royalty valuation regulations in existence on the effective date of the leases. Defendants *wanted* the leases to contain such restriction. They did *not want* the government to have the power to change, at some later date, the royalty deal they had made with the government when they accepted their leases.

50.     The standard OCS lease forms promulgated after 1971 all are to the same effect as the above quoted Section 1 from the 1971 form, but with some excess verbiage eliminated. The Form MMS-2005 (August 1982) for OCS oil and gas leases and the Form MMS-2005 (March 1986) that superceded the 1982 form both contain the following language for Section 1:

> "**Sec. 1. <u>Statutes and Regulations.</u>** This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462, 43 U.S.C. 1331 et seq., as amended (92 Stat.629)(hereinafter called the "Act.") The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; **and all other applicable statutes and regulations**."(emphasis in original)

---

[1] As they all are well aware, the government has long recognized that its "waste" regulations are separate and apart from its "royalty valuation" regulations. *See, e.g.,* 30 CFR § 206.100 (July 1, 1987).

51.     In this lease form, the general phrase "all other applicable statutes and regulations" very clearly refers to statutes and regulations <u>other than</u> the "Act" (OCSLA) and the presently existing regulations issued under the "Act" referred to earlier in the sentence. The specific always controls over the general; and language is construed so as not to create an inconsistency or conflict. The "other applicable statutes" cannot refer to the "Act" (OCSLA) already specifically identified; and "other regulations" means regulations under the "other statutes" referred to in this final, general, cover-all phrase, not the previously described "regulations issued pursuant to the Act and in existence upon the Effective Date of this lease."

52.     In the Form MMS-2004 (June 1991) for OCS mineral leases, the second sentence of Section 1 is identical to that quoted in the preceding paragraph in the 1982 and 1986 MMS-2005 oil and gas lease forms. The first sentence reads:

> "This lease is issued pursuant to the Outer Continental Shelf (OCS) Lands Act of August 7, 1953, as amended (43 U.S.C.1331-1356), (hereinafter called the "Act"), **and the regulations issued thereunder (30 CFR 281).** This lease is issued subject to the Act, all regulations and orders issued pursuant to the Act and in existence upon the Effective Date of this lease, all regulations and orders, subsequently issued pursuant to the Act, that provide for the prevention of waste and conservation of the natural resources of the OCS and the protection of correlative rights therein, and all other applicable statutes and regulations." (emphasis added).

53.     30 C.F.R. § 281 cited in this 1991 OCS lease form establishes the procedures for leasing OCS lands for minerals other than oil, gas and sulfur. Section 281.29 provides: "The method of valuing the product from a leasehold shall be in accordance with regulations of this chapter and procedures prescribed in the leasing notice **and subsequently issued lease."** (emphasis added).

54.     This confirms the Secretary's acceptance and acknowledgment that OCS royalty valuation regulations apply only to a **"subsequently issued lease"** and not to any OCS leases

issued **before** the promulgation of particular royalty valuation regulations that could otherwise be claimed to affect such leases already issued and in effect.

### Some Relevant Federal Statutory Provisions

55.    The Outer Continental Shelf Lands Act ("OCSLA") which govern all OCS leases was originally enacted in 1953.  OCLSA was amended extensively in 1978.  The 1978 amendments added a statutory definition of "production."  That statutory definition is as follows:

> "(m) The term **'production' means** those activities which take place after the successful completion of any means for the removal of minerals, including such removal, field operations, **transfer of minerals to shore,** operation monitoring, maintenance, and work-over drilling;" (emphasis added)

43 U.S.C. § 1331(m).  Section 1331 also defines "minerals" as including oil and gas.

56.    When this statutory definition of "production" was enacted in 1978, the then-existing royalty valuation regulations referred to below contained no provision allowing the deduction of any transportation costs from royalty payments.

57.    This statutory definition of "production," as including "transfer of minerals to shore," was also enacted against the background not only of consistent state court decisions in the states adjoining the Outer Continental Shelf defining "royalty" as an interest in oil and gas free of all costs of "production," but also of consistent  administrative and judicial decisions  that no costs that are properly classified as costs of "production" can be deducted from federal royalty payments.

58.    The first stated purpose of the Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA") was "(1) **to clarify, reaffirm, expand and define the responsibilities and obligations of lessees, operators, and other persons involved in transportation or sale of oil and gas from the Federal and Indian lands and the Outer Continental Shelf."** (emphasis added).  30 U.S.C. § 1701(b)(1).  The legislative history shows the primary concern of Congress

was royalty underpayments to the U.S. Government.  1982 U.S. Code Cong. & Admin. News pp.4269-72.

59.    The second section of FOGRMA  clarifies, reaffirms, expands and defines the obligations of lessees and other persons involved in the transportation of gas from federal and Indian lands and the Outer Continental Shelf, beyond OCSLA,  by defining "production" as follows:

> (13) **'production' means** those activities which take place for the removal of oil or gas, including such removal, field operations, **transfer of oil or gas off the lease site**, operation monitoring, maintenance, and workover drilling." (emphasis added).

30 U.S.C. § 1702(13).

60.    By virtue of this statutory definition of "production," all transfer of gas off OCS leases is part and parcel of  "production, " without any littoral limitation as provided in OCSLA.

61.    By virtue of this statutory definition of "production," all transfer of gas off federal onshore and Indian leases is part and parcel  of "production," regardless of distance.   When MMS issued its 1988 Royalty Valuation Regulations, it referred repeatedly to FOGRMA, and reiterated: "Costs of production and post-production costs are lease obligations which the lessee must perform at no cost to the Federal Government or Indian owner. 53 Fed. Reg. 1241 (January 15, 1988).

62.    By virtue of this statutory definition of production, all costs of transporting gas off the lease site are costs of production.  Costs of production have never been legally deductible from federal royalty payments.  Defendants have deducted such costs of transfer of gas off federal lease sites from their federal royalty payments, in knowing violation of these controlling statutes with which all defendants' are intimately familiar.

63.     When FOGRMA was enacted, the MMS royalty valuation regulations then in effect did not provide any allowance for deductions from royalty payments for costs of transportation of gas from the lease sites.  Thus, there was no conflict or inconsistency between FOGRMA and such subordinate regulations.  The inconsistent 1988 Regulations allowing deductions for transportation costs must yield to the clear expression of Congressional intent expressed in both FOGRMA and OCSLA.  *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843 (1984).  The 1988 regulations themselves provide that if the specific provisions of any statute are inconsistent with any regulation, the statute governs.

64.     The "Federal Oil and Gas Royalty Simplification and Fairness Act of 1996" amended many of the statutory definitions enacted by 1982 FOGRMA. Public Law 104-185, 104th Congress, Aug. 13, 1996. But that act did not amend the 1982 FOGRMA definition of production. Transfer and the cost of transfer of gas off federal and Indian lease sites remains part of production and production costs.  Cost of transfer of gas off federal and Indian lease sites remains part of production cost.  No production costs have ever been legally deductible from *any* royalty payments – federal, state or private.

**Some Relevant MMS Gas Royalty Valuation Regulations**

65.     The currently effective MMS royalty valuation regulations were promulgated effective March 1, 1988, and have been amended in small aspects at various times since then.

66.     The preceding MMS royalty valuation regulations were the regulations originally promulgated in 1979.

67.     The 1988 OCS royalty valuations regulations are applicable only to the OCS leases issued **subsequent** to the issuance of such 1988 regulations.  As shown above, OCS leases

by their own controlling lease terms are subject only to royalty valuation regulations "**in existence on the Effective Date of this lease.**"

68.     Thus, the 1979 royalty valuation regulations or their predecessors are the applicable and controlling regulations with respect to all OCS leases issued prior to March 1, 1988.

69.     A large portion of the presently producing OCS leases were issued prior to March 1, 1988. OCS gas production generally has accounted for some 70%-80% of total federal gas production.

70.     The result is that the 1979 and prior OCS gas royalty valuation regulations are as significant (or perhaps more significant) to this litigation than the current 1988 gas royalty regulations.

71.     The 1979 OCS gas royalty valuation regulations are a model of simplicity, clarity and brevity. They consist only of *three* simple, clear and brief sections. They occupied less than *one-half of one page* in the Federal Register. 44 Fed. Reg. 61903 (October 26, 1979).

72.     By contrast, the current 1988 MMS royalty valuation regulations occupy some *106* pages.

73.     The first section of the three-section 1979 OCS gas royalty valuation regulations provides: "Under no circumstances shall the value of production be less than the gross proceeds accruing to the lessee from the disposition of the produced substances or less than the value computed on the reasonable unit basis established by the Secretary." 30 CFR § 206.150 (July 1, 1987). So far as Wright is aware, the Secretary never has established a reasonable unit value of gas produced from the OCS. Therefore, "under no circumstances" can the value of OCS gas production from leases executed before March 1, 1988 be "less than the gross proceeds accruing

to the lessee from the disposition of produced substances" (here gas, NGL and downstream condensate).

74.     The same section begins: "The value of production shall never be less than the fair market value." *Id.* Therefore, consistently with the royalty provisions of the OCS leases themselves, this regulation, also requiring both that value cannot be not less than "gross proceeds" and cannot be less than the "fair market value," imposes the dual requirement that the value of OCS gas, NGL and downstream condensate production can **never** be less than the **higher** of "gross proceeds" or "fair market value."

75.     This means, for example, that if a lessee sells gas, NGL or downstream condensate at  one price either to a marketing or other affiliate or independent third party who resells it at a higher price, the lessee must pay royalty calculated on the higher price establishing fair market value,  instead of any lower price claimed to be the "gross proceeds accruing to the lessee." Defendants have failed to do this.

76.     The second section of the 1979 OCS gas regulations is entitled "Royalty on unprocessed gas."  30 CFR § 250.151 (July 1, 1987). Because all or virtually all OCS gas is processed, this section has little if any  application.  In addition,  this section for "unprocessed gas"  issued in 1979 provides: "The value shall not be less than that which would accrue by computing royalty in accordance with subsections 250.67 (a) through (d) (the "processed gas" provision).  Thus the provision relating to "processed" gas controls in all situations.

77.     The third and final section of the 1979 OCS gas regulations (Section 250.67 in the 1979 regulations),  is entitled "Royalty on processed gas and constituent products." It provides in relevant part:

> "(a) When gas is processed for the recovery of constituent products, a royalty established by the terms of the lease will accrue on the value or amount of"

(1)     All residue gas remaining after processing; and

(2)     All natural gasoline, butane, propane, or other substances extracted from the gas. A reasonable allowance, determined by the Director and based on regional plant practices and actual plant costs and other pertinent factors, may be made for the cost of processing and may be deducted from the royalty payment due on said constituent substances. * ** *

(d) No allowance shall be made for boosting residue gas or other expenses incidental to marketing."

30 CFR § 206.152 (July 1, 1987).

78.     This provision cannot be claimed to apply only when the processing of gas is done by the lessee or some affiliate of the lessee. Rather, this provision applies "when gas is processed," regardless of who does the processing. If the gas is processed, royalty must be paid both on the residue gas and all NGL and "other substances extracted from the gas."

79.     Under this provision, if gas is processed for the removal of constituent products, a royalty must be paid on all residue gas and all "constituent products" – all "substances extracted from the gas." That is clear; simple and fair.

80.     By virtue of Section 206.150, as shown above, the lessee must pay royalty on the *higher* of "market value" or "gross proceeds" of all residue gas and all "constituent products" or "substances" recovered or extracted from the gas. These include NGL and condensate.

81.     Clearly if a lessee has conspired with a pipeline company gas transporter or a platform or plant operator to conceal condensate production from the government to avoid, conceal and reduce the lessee's royalty payments, by agreeing to share such unreported condensate with such third party transporter or operator – which Defendants have done – the lessee must pay the higher "market value" of **all** such concealed and unreported condensate

production, rather than the lower "gross proceeds" accruing to the lessee's less than 100% share of such shared and unreported condensate production. That also is clear, simple and fair.

82. As shown by the quotations above, the OCS gas royalty regulations issued in 1979 allow a reasonable processing deduction from royalty payments if the Director has determined such allowance based, *inter alia,* on "actual plant costs." Wright believes that "actual plant costs" have rarely if ever been furnished to the Director. If this is correct, this provision for processing cost deduction from royalty payments will rarely if ever be applicable.

83. In addition, this provision allowing a deduction for processing cannot be applied to OCS leases requiring royalty payments on not less than "gross proceeds," because "gross proceeds" means "all proceeds <u>without any deductions.</u>" As to these leases, the subordinate regulations are inconsistent and must yield to the controlling lease terms.

84. Regardless, it is clear that the 1979 OCS gas royalty valuation regulations issued in 1979 **do provide** for a *processing* deduction under certain circumstances. However, it is equally clear that such regulations **do not provide** for **any** *transportation* allowance deduction under **any circumstances.**. This is consistent with the 1978 amendments to OCLA defining production to include "transfer of minerals to shore" and 1982 FOGRMA defining production to include "transfer of oil and gas off the lease site" without any littoral limitation.

85. The later 1988 gas royalty valuation regulation applicable to processed gas produced from both OCS and onshore federal leases is set forth in the lengthy and detailed Section 206.153 of such 1988 regulations. Subsection (h) of Section 206.153 provides:

> "(h) Notwithstanding any other provision of this section, under no circumstances shall the value of production for royalty purposes be less than the gross proceeds accruing to the lessee for residue gas and/or any gas plant products **less applicable transportation allowances** and processing allowances **determined pursuant to this subpart."** (emphasis added)

86.     The emphasized portion of this Section 206.153(h) is inconsistent with the OCS lease provisions requiring that the value of production shall not be "less than the gross proceeds accruing to the lessee from the sale thereof" – without any allowance for transportation costs.

87.     The emphasized portion of Section 206.153(h) also is inconsistent with the statutory provisions of OCSLA and FOGRMA quoted above defining "production" to include, respectively, "transfer of minerals to shore" and "transfer of oil and gas off the lease site."

88.     The first section of the present 1988 federal gas royalty valuation provisions is Section 206.150, entitled "Purpose and Scope." It provides as follows:

"(a).   This subpart is applicable to all gas production from Federal oil and gas leases. The purpose of this part is to establish the value of production for royalty purposes **consistent with the mineral leasing laws and lease terms.**

(b)     **If the specific provisions of any statute** or settlement agreement between the Untied States and a lessee resulting from administrative or judicial litigation, **or oil and gas lease subject to the requirements of this subpart, are inconsistent with any regulation in this subpart, then the lease, statute,** or settlement agreement **shall govern to the extent of the inconsistency.**

(c)     All royalty payments made to MMS are subject to audit and adjustment.

(d)     **The regulations in this subpart are intended to ensure that the administration of oil and gas leases is discharged in accordance with the requirements of the governing mineral leasing laws and lease terms.**

89.     Under this provision, because the allowances for transportation deductions from federal royalty payments are inconsistent with the specific provisions of the controlling OCS leases and the controlling OCSLA and FOGRMA statutes, the lease provisions and the statutes control; and no transportation allowances can be deducted from federal royalty payments. Defendants always have known this. Defendants have falsely taken deductions for transportation. In addition, at some time before August 2, 1996, they have conspired with each

other to take such deductions from royalty payments on federal gas production. They have done this both on production from OCS leases and on production from onshore federal and Indian leases.

90. 1988 Regulation Section 206.152, relating to valuation of unprocessed gas, has a somewhat different subsection (h):

> "(h) Notwithstanding any other provision of this section, under no circumstances shall the value of production for royalty purposes be less than the gross proceeds accruing to the lessee for lease production, **less applicable allowances.**"

(emphasis supplied) As shown above, the circumstances under which allowances are "applicable" are limited by the particular lease terms and controlling statutes.

91. The different, but similar, 1988 regulations covering Indian gas contained similar provisions with similar effect, so that the result under controlling FOGRMA, applicable equally to federal and Indian leases, has been that no transportation deductions can legally be taken from Indian royalty payments. 30 CFR §§ 206.170, 206.172(h), and 206.173(h) (July 1, 1998).

92. The Indian gas royalty valuation regulations were revised in 1999. Present Section 206.174(g) contains a provision similar to former §§ 206.172(h) and 206.173(h), but "gross proceeds accruing to the lessee" has been clarified as "(including affiliates)." 30 CFR 206.174(g) (July 1, 2003). Controlling FOGRMA continues to prohibit the transportation deductions purportedly, but inconsistently, allowed in these regulations.

93. As set forth more fully below, the 1988 MMS regulations provide that MMS may require the lessee to certify that its arm's-length contracts for the sale of gas include "all of the consideration to be paid by the buyer, either directly or indirectly, for the gas." 30 C.F.R. §§ 206.152(b)(3) (July 1, 2003) (unprocessed gas).

94. The regulations also provide:

"If the contract does not reflect the total consideration, then MMS may require that the residue gas or gas plant product sold pursuant to that contract be valued in accordance with paragraph (c) of this section. **Value may not be less than the gross proceeds accruing to the lessee, <u>including the additional consideration.</u>**

30 C.F.R. § 206.153(b)(1)(ii) (July 1, 2003) (emphasis supplied) (processed gas). As set forth below, defendants in various instances, such as rebates on transportation costs, reservation charges received, and aggregation premiums obtained, have **not** taken into account such additional considerations as required by this regulation and so have not reported their "total" gross proceeds.

### How Defendants Have Made False Statements And False Records To Conceal, Avoid And Decrease Their Obligations To Pay And Transmit Royalty Money To The Government

95.     The collection of government royalties on all federal, and Indian tribal and allotted, lands, is administered by the Minerals Management Service ("MMS") of the United States Department of the Interior ("DOI"). MMS requires each lessee, owner or operator of a federal or Indian lease to file a monthly report of production and royalty remittance for the preceding production month, on a form designated as MMS-2014.

96.     This MMS-2014 report form requires the reporter to state for each lease, among other things, (1) the "sales quantity," (2) the "sales value," (3) the "royalty quantity," and (4) the "royalty value" for each separate type of production from each lease covered by the report. A copy of a recent MMS-2014 Form is attached to this complaint.

97.     The various types of production are required to be identified by a "product code" number on the report (item 7). The MMS product code for the MMS-2014 report form has been designated in MMS instructions to royalty payors as follows:

```
01  - "Oil"
02  – "Condensate"  (generally referred to as "lease condensate")
03  – "Processed (residue) gas" (called just "residue gas" in the regulations)
```

04 – "Unprocessed (wet) gas" (called just "unprocessed gas" in the regulations)
05 - "Drip or scrubber condensate" (referred to herein as "downstream condensate")
06 – omitted in MMS Oil and Gas Payor Handbook for Form MMS-2014
07 - "Gas Plant Products" (referred to in this complaint as "NGL")
15 - "Fuel gas lost"
16 - "Gas lost – flared or vented"
19 - "Sulfur"
20 – "Other liquid hydrocarbons (pit, skim and slop oil)" and other products not relevant to this action.

98.     Thus, the royalty payor must state to the government each month with respect to each lease (1) the sales quantity, (2) the sales value, (3) the royalty quantity, and (4) the royalty value – separately with respect to each separate product identified above that actually has been produced from the lease during such month.

99.     Form MMS-2014 in the past has included the following statement:

"WARNING: This is to inform you that failure to report accurately and timely in accordance with the statutes, regulations or terms of the lease, permit, or contract may result in late payment charges, civil penalties, or liquidated damages being assessed without further notification. Intentional false or inaccurate reporting is subject to criminal prosecution in accordance with the applicable Federal law(s)."

100.    In addition, Form MMS-2014 has a signature line which bears the following statement: "I have read and examined the statements in this report and agree that they are accurate and complete."

101.    Defendants have had knowledge of the "gross proceeds" and "total consideration" actually received by them for their lease production of gas (both unprocessed (wet) gas and residue gas), NGL and condensate produced from each of their federal and Indian leases. They also have had actual knowledge of the "market value" and "fair market value" of all such production.

102.    Since sometime before August 2, 1996, Defendants have known that their "gross proceeds" or "total consideration," or the "fair market value" or "market value," of such

production was greater and higher than the "sales value" and the "royalty value" reported on each of their Form MMS-2014 reports filed with the government on the basis of which their accompanying royalty payments to the government were paid to the Government.

103.    Therefore, since sometime before August 2, 1996, as to each lease covering federal or Indian lands in which any Defendant has had an interest, each monthly MMS-2014 monthly report filed by or on behalf of such Defendant has knowingly and falsely understated the amounts actually owed and paid to the Government, and transmitted to it with such reports, to conceal, avoid or decrease such Defendant's obligation to pay or transmit money to the government.

### Numerosity and Time Period of Fraudulent Transactions

104.    Such false statements or records have been made both with respect to "sales value" (for 100% of the sales – item 13 of the report) and for "royalty value" (for the royalty percentage of the sales value – item 18 of the report). Thus, there have been at least two false statements on each such monthly Form MMS-2014 for each separate product reported.  On each monthly Form MMS-2014 reporting multiple products (residue gas, gas plant products and "downstream condensate"), each such may contain at least six false statements (3 products x 2 "values").

105.    If NGL or condensate (or any other product) has actually been recovered from the lease but has not been reported, then,  with respect to each such product not reported, there are three (3) false statements: (1) the statement in the Product Code item of the report omitting such product actually recovered, (2) the statement of "sales quantity" (item 13 of the report) and (3) the statement of "royalty quantity (item 18 of the report).

32

106.   As a result: (1) less than 25% of the NGL actually produced from federal and Indian leases have been reported as such (because of false reporting of the gas as "unprocessed" and the other schemes detailed below); (2) even less than 25% of downstream condensate has been reported; and (3) residue gas sales values have been consistently understated both by virtue of unlawful transportation deductions and the various other separate schemes detailed below.

107.   Therefore, on average there may have been **more than four** false statements on each Form MMS-2014 for each lease each month included in this underpayment action. There are some 25,000 or more separate producing federal and tribal Indian leases – exclusive of the leases on lands owned by individual Indian allottees numbering in the tens or hundreds of thousands.

108.   On the basis of an average of four false statements per lease for each of just 25,000 leases each month included in this action there have been millions of actionable false statements covered hereby, the minimum statutory mandatory civil penalty for each of which is $6,000 and the maximum statutory mandatory civil penalty for each of which is $11,000.

109.   It is a practical impossibility for Wright to plead with any more specificity each of such many millions of false statements and false transactions in this complaint. When as here the fraudulent transactions are numerous and extend over a long period of time, the law relaxes the particularity requirements of Fed.R.Civ.P. 9(b).

### Defendants' Control of Relevant Information

110.   Defendants have filed all their Form MMS-2014 reports with the government as confidential and proprietary information protected from disclosure under the Freedom of Information Act ("FOIA). The government has accepted such claims of the confidential and proprietary nature of such reports, and will not produce them even upon a FOIA request.

111.   These records are necessary to prove the actual amount of royalty payments made by defendants to the government. They are not available to Wright. The only copies are in the exclusive possession of the defendants who will not disclose them; and the originals are in the possession of the government who will not produce them under a FOIA request.

112.   Defendants also claim that the contracts whereby they have sold their gas and NGL and condensate produced from federal and Indian lands are confidential and proprietary, and protected from disclosure, because of the pricing information contained in them. Defendants have exacted confidentiality and non-disclosure agreements from their purchasers. Even when defendants or their purchasers have been required to file such contracts with government agencies – such as the New York Public Service Commission as just one example – the pricing provisions have been redacted prior to filing.

113.   Wright's claims are that actual royalty payments have been less than actual gross proceeds (as well as less than true market values). The information required to prove both components of these claims, *i.e.,* (1) gross proceeds, and (2) actual royalty payments reported and paid to the government, have been and are in the sole and exclusive possession of the defendants.

114.   Where the necessary information is in the possession of the defendants, the law relaxes the requirement of Fed.R.Civ.P. 9(b) that fraud be pled with particularity.

115.   Because necessary components of the claims asserted in this complaint are in the exclusive possession of the defendants, all of such claims are asserted by Wright on his information and belief derived from his more than 50 years' experience in the industry and with these particular defendants, and on the diligent investigations he has made to support this action.

**Processed Gas and Unprocessed Gas**

116.     As stated above, the current MMS regulations have similar, but different, valuation regulations for "processed" gas and "unprocessed" gas.  The controlling statutes and leases make no such distinction.

117.     The standard unit of measurement of gas volumes is one MCF (one thousand cubic feet).

118.     When natural gas is withdrawn from the reservoir and arrives at the wellhead (often called "wellhead" or "wetstream" or just "wet" gas), it is composed largely of methane ("dry" or "residue" gas).  But it also contains both (1) contaminants (such as water, nitrogen, sulfur and carbon dioxide) and (2) natural gas liquids ("NGL") such as ethane (C2), propane (C3), butane and isobutene (C4), pentane (C5), and natural gasoline (C5+)  - often called "pentanes plus").

119.     Such wellhead or wetstream gas also contains some amounts of what is usually referred to as  "condensate." – technically also a "pentane plus." Condensate is a  very light "oil" with a gravity of more than 40 degrees – as compared to heavier oils with gravities ranging upward from very heavy oils of 10 degrees gravity to average gravities in the 25-35 degree gravity range.

**How Gas, NGL and Condensate Get To Market**

120.     Some of this condensate is measured and recovered at the onshore lease or offshore lease production platform by lease separators. This condensate, referred to as "lease condensate," is treated as "oil" under the MMS oil royalty valuation regulations. "Condensate recovered in lease separators or field facilities is considered to be oil." 30 CFR § 206.101 (July 1, 2003).  Such lease condensate, *to the extent reported  by defendants on their Form MMS-2014*

*reports under Product Code 1 (oil) or 02 (condensate)* was covered by the settlements in the FCA Oil Royalty Case and is not within the scope of this action.

121.    Other onshore condensate is removed at various points along onshore pipelines; while other OCS condensate is recovered at intermediate offshore platforms between the offshore wells and the onshore NGL processing plants. Still other OCS condensate is recovered by separation facilities – called "scrubbers" or "slug catchers" – located nearer to or at the NGL processing plants themselves. All of this condensate recovered downstream of the oil royalty measurement points is considered "gas" and is included in this action. See 30 CFR § 206.153(a)(2).

122.    Some offshore platforms have only one line leading to shore, in which both the oil and lease condensate, and the gas/NGL, are re-injected after initial separation and measurement; other OCS platforms have two lines leading toward shore, one for oil and lease condensate, and the other for gas and NGL, including the portion of the condensate not recovered at the initial lease separation stage. Some condensate recovered on OCS platforms is picked up by barges and taken to market in this manner.

123.    Onshore gas fields may have comparable arrangements, in which the condensate recovered at the initial lease separator stage may be trucked to market, and the wetsteam gas with NGL and remaining condensate in solution is transported away from the lease via a single gas pipeline. If the amount of oil produced from the field justifies it, there will be a separate oil pipeline connecting to the field.

### "Non-Associated" or "Gas Well" Gas and "Associated" or "Casinghead" Gas.

124.    Gas is produced both from gas reservoirs and in association with oil from oil reservoirs. Gas produced from gas reservoirs is sometimes referred to as "gas well gas," or

"non-associated gas." Gas produced in association with oil from oil reservoirs is called interchangeably both "associated gas" and "casinghead" gas.

125.  "Casinghead" or "associated" gas produced from oil fields almost invariably is much richer in NGL – and therefore much more valuable – than "gas well" or "non-associated" gas produced from gas fields. While gas well gas may average only 1-3 gallons of NGL per mcf ("gpm"), casinghead gas recovered in association with oil production may average 3- 8 gallons of NGL per mcf , and occasionally up to 10-12 gpm.

### Non-Market Places and On to Real Market Places

126.  The OCS gas is produced both at wellheads located on fixed or floating offshore production platforms on the water surface of the lease, and at subsea wellheads on the ocean floor "tied back" via underground gathering lines to production platforms on the closest available offshore surface facility.

127.  Because a "market" by legal definition is a place where willing buyers and willing sellers meet and compete to make trades, it is axiomatic that there can be no "market value at the wellhead" with respect to a sea floor wellhead located a mile or more beneath the surface of the ocean. The tremendous pressure per square inch there would compress any venturing gas trader to the size of the period at the end of this sentence.

128.  Likewise, there can be no real "market value" for OCS gas at the offshore platform where the gas first rises above the surface of the ocean. This is because typically the only outlet for that gas at that point is a "gathering" line, which is not a common carrier and is exempt from the jurisdiction of the Federal Energy Regulatory Commission under the Natural Gas Act or NGPA – which does not extend to "gathering" operations. Competing buyers do not gather at these OCS platforms to make competitive bids for the gas under the sole and

exclusive control of the producer-lessee.  It typically also owns or controls the only gathering lines leading from the OCS platforms.

129.    Whether produced offshore or onshore, at the first convenient point closest to the wellhead, the gas is measured and its NGL content (gallons per mcf, or "gpm") determined with respect to each of the recoverable NGL components, e.g., ethane, propane, etc.

130.    Whether produced onshore or on the OCS, wetstream gas is gathered from the wellhead via gathering systems to a larger pipeline, and transported from there to an NGL processing plant.

131.    At the NGL plant, the remaining contaminants and condensate are first removed, and then the gas is processed for the recovery of some or all of the NGL.  After separation and removal of the NGL, the remaining gas – referred to variously as  "residue" or "dry"  or "tailgate" or "pipeline" gas – is either redelivered to the same pipeline, or delivered to another pipeline, for transportation to the end users.

132.    Because the large onshore NGL plants that process huge quantities of OCS gas are located on major pipeline systems near the shore—sometimes the same system that brought the gas ashore – these plants, and some similar plants processing onshore gas, are often referred to as "straddle plants."

133.    Modern cryogenic processing plants typically remove most of the NGL components of the wetstream gas, including a large percentage of the ethane. Ethane is the most difficult and expensive component to remove, because it is the lightest and requires the coldest temperature for it to condense out of the wetstream gas.  Ethane is also the least valuable of the NGL components – often selling for less than 20 cents per gallon.  When the market price for ethane is very low, NGL plants may not remove some or all of the ethane.  Infrequently, during

periods when the market prices for all NGL is very low, and depending on the relative "richness" or "leanness" of the particular wetstream gas, it may be allowed to bypass the NGL plant entirely, with no NGL removed.

134.    Typically, the NGL stream leaving the NGL plant consists of a mixture of ethane, propane, butane, isobutene, pentane and natural gasoline. This mixture is commonly referred to as "raw mix" or "raw make." If the heavier hydrocarbons have been separated from the lighter ethane and propane, the mixture of the latter is called "E-P mix."

135.    At the tailgate of the NGL "straddle" or other processing plant, the NGL raw mix is measured for how much of each NGL component it contains, and then is typically transported via pipeline to a "fractionating" plant. At the fractionating plant, the NGL raw mix is separated into its various NGL components of ethane, propane, butane, isobutene, pentane and natural gasoline. These NGL components are then marketed for various uses. Sometimes the natural gasoline is called "condensate" and marketed as such.

136.    The largest concentration of fractionating plants and NGL processing plants in the world is located at Mt. Belvieu just east of Houston. As a result, the "Mt. Belivieu" prices for NGL are the "marker" prices for NGL spot prices world-wide.

137.    But the widely quoted, daily published "Mt. Belvieu" prices for NGL (1) are only "spot" prices – the prices for NGL that have not previously found any contract "home," and (2) are subject to manipulation by defendants and others. Because the major, integrated defendants generally produce from their own gas production less NGL than they need to consume in their refinery, petrochemical and chemical operations, they generally are not net sellers in the NGL spot markets.

138.   NGL components are used both as feedstock in oil refineries and as feedstock in the petrochemical industry in which some of defendants are large if not controlling members. Thus, the actual "gross proceeds" of a large part of the NGL produced by the integrated defendants are the much higher values that accrue to them farther downstream than the fractionating plants at Mt. Belvieu and elsewhere.

139.   Propane, and to a lesser extent butane, are also used as heating fuel, largely in rural areas.  Natural gasoline and isobutene  can be used in oil refining as gasoline blending agents.

**Measurement Units and Gas Sales Units**

140.   While the *volume* of gas is measured in MCF's, the *energy value* of gas – which is the *pricing basis* for gas – is measured in terms of its heat content or BTU (British Thermal Unit) value.

141.   Pipeline quality gas delivered at the tailgate of an NGL plant contains about 1000 BTU per cubic foot, or one million BTU's (MMBTU) per one thousand cubic feet (MCF).  By contrast, unprocessed, wetstream gas with its NGL content may contain 1500 or more BTU's per cubic foot, or 1.5MMBTU per MCF.

142.   Because gas is quoted and sold on a MMBTU basis, in an arm's-length sale, the price of unprocessed gas will exceed the price of dry processed gas, because the unprocessed gas has a higher BTU content.  For example, if the price of gas is $2.00 per MMBTU, then dry, processed gas containing 1 MMBTU per MCF would price at $2.00 per MCF.  By comparison, unprocessed gas containing its NGL which had 1.5 MMBTU per MCF would be valued at $3.00 per MCF.

**A Controlling Fact of the Market-Place**

143.    It is critical to understand that NGL and condensate that are extracted and sold separately command a higher price than when they are sold in unprocessed wetstream gas. Stated differently, the market price per BTU of extracted NGL and condensate is higher than the market price per BTU of such NGL and condensate in the wetstream gas.  Stated still another way, wet gas commands a lower price on a BTU basis than the combination of the NGL and the remaining residue gas.

144.    What this means is that, because the value of the unprocessed residue gas plus the processed NGL and condensate will command a higher price, even after paying processing costs, than the price/value of the unprocessed wetstream gas, a producer-lessee can usually increase his profits substantially by processing his wetstream gas and selling separately the processed dry gas, the NGL and the downstream condensate.

145.    What this also means is that if the producer-lessee can pay his royalty owner on the basis of the lower wetstream value instead of the increased value he has received by processing, he will be even further ahead of the game.  He will have received 100% of the increased value from processing – not just 5/6th of 7/8th of the "gross proceeds" of the dry residue gas plus the NGL plus the downstream condensate.  This additional, overreaching profit has been the motivation for various large scams on the government and the taxpayers that this action seeks to remedy.

**Amount of Unreported NGL Production**

146.    Since sometime before August 2, 1996, Defendants have failed to pay royalties on many billions of gallons of NGL produced from federal and Indian lands.  Although the NGL content in unprocessed gas of course varies from field-to-field and, to a lesser extent, from well-

to-well within a field, it is possible to estimate roughly the extreme degree to which defendants have under reported their NGL production from federal lands and defrauded the Government.

147.    Federal production accounts for more than one-third of the nation's total gas production and comes from thousands of different fields across the country. On average, federal gas contains at least as large a proportion (and potentially a greater proportion) of recovered and recoverable NGL than gas produced from non-federal lands – in part because essentially all OCS gas is processed and not all non-federal gas is processed.

148.    Overall, NGL content of gas produced from all federal lands should be at least as high as the NGL content in gas produced from non-federal lands. Thus, for example, in any year in which federal leases accounted for 34% of the nation's total gas production, those federal leases should account for at least (and possibly more than) 34% of the nation's NGL production.

149.    Federal royalty records for 1994 indicate that NGL production reported from federal leases for royalty purposes represented only 8.79% of dry gas production. Similarly, annual state production figures show that NGL production per mcf ("gpm's) falls far short of federal production. This disparity indicates widespread non-reporting of NGL production from federal lands.

150.    In 1996, for example, OCS lessees reported to the federal government that combined royalties were owed on only 1.467 billion gallons of NGL produced from offshore Louisiana properties; **but actual NGL production from these properties totaled about 6.132 billion gallons.** These statistics indicate federal lessees paid royalties on less than 25% of actual NGL production as such from offshore federal leases.

151.    In 1997, the overall NGL content for all Texas gas production was 2.809 gallons per MCF (gpm). However, federal lessees of Texas OCS leases paid royalties as such on only

0.0958 gallons of NGL per MCF of processed gas, **or less than four (4%) per cent of the state-wide average gpm.**

152.    This same pattern of NGL under reporting also occurred in New Mexico where about 50% of all land is federal or Indian land.  In 1997, for example the total NGL per MCF reported for federal royalty payments was 0.6638 gpm.  At the same time, all New Mexico processors reported an average production of 3.17 gpm.  Thus, federal royalties appear to have been paid on only about twenty one percent (21%) of NGL that actually was produced from federal and Indian lands in New Mexico.

153.    The OCS Gulf alone currently produces more than 13 Billion cubic feet (BCF) of gas  per day.  Assuming a conservative 1.5 gallons per MCF (thousand cubic feet) of NGL, that represents 19.5 million gallons of NGL per day produced from the Gulf OCS, or 3.25 million gallons of NGL per day attributable to the 1/6th government royalty interest.

154.    If royalties have only been paid on 25% of those 3.25 million royalty gallons then each day royalties have not been paid to the federal government on 2.4375 million gallons (58,036 barrels) of NGL.   NGL may average in value $.20 per gallon or $24.00 per barrel.  But even at $5 per barrel that would represent royalty underpayments of $291,667.00 per day.

**Amount of Unreported Condensate Production**

155.    OCS pipeline gas tariffs often limit allowable condensate (at least without surcharge) to 10 barrels per million cubic feet.  This is because excessive amounts of condensate causes operational problems for pipelines, including accumulation of frozen ice hydrates in the near-freezing temperatures on the sea floor of the semi-tropical Gulf of Mexico.  If it be assumed that all OCS gas pipelines are carrying 10 barrels of condensate per million cubic feet (MMCF), then on 13 BCF daily of OCS gas production there would be 130,000 barrels daily of OCS

downstream condensate production, or 21,667 barrels daily to the government's 1/6[th] royalty interest.

156.    Defendants have failed to report much of the actual OCS downstream condensate to MMS, and no royalties have been paid on a large portion of such condensate.

157.    This condensate, sometimes labeled as "retrograde condensate" for marketing purposes, generally sells on the market at the same price quoted and paid for "Louisiana Light Sweet" ("LLS") crude oil. LLS oil generally sells for a premium – sometimes as high as $1.00 per barrel but generally at least $.25-$.50 cents per barrel – above "WTI" or West Texas Intermediate crude oil, which is the national "marker" crude oil for market pricing purposes.

158.    If the unreported OCS condensate royalty barrels total 10,000 barrels per day, and average only $20 per barrel in value, that would represent daily royalty underpayments to the government of $200,000.00 per day.

## VI.
## INCORPORATION BY REFERENCE

159.    Each of the separate and different claims set forth in the numbered sections below incorporates by this reference, pursuant to Fed.R.Civ.P. Rule 9(b), all facts and matters set forth in both the preceding and the succeeding sections of this complaint.

## VII.
## DEFENDANTS ENGAGED IN A FRAUDULENT SCHEME TO CONCEAL NGL PRODUCTION FROM FEDERAL ROYALTY OBLIGATIONS BY THE COMBINED USE OF VARIABLE OWNERSHIP NGL STRADDLE PLANT AGREEMENTS WITH PERCENTAGE OF PROCEEDS ("POP") PROCESSING AGREEMENTS[2]

160.    "Percentage of Proceeds" ("POP") contracts are a common type of agreement for processing wetstream gas.  Under a POP contract, the producer-lessee agrees to deliver its

---

[2] The claim asserted in this section is applicable only to federal or Indian gas processed pursuant to a percentage of proceeds or other similar processing contract **and which is** processed at a NGL processing plant that is subject to a variable ownership or similar  agreement to which the producing lessee or affiliate or controlled entity or division of such lessee is a party.

unprocessed gas to the processor. The processor retains a percentage of the NGL extracted as a processing fee, and returns to the producer all residue gas and the remaining percentage of the NGL.

161.     Where the producer-lessee sells its unprocessed gas to an unrelated processor pursuant to an arms'-length contract, current MMS regulations require that the producer pay royalty based on "gross proceeds" from the sale.  30 CFR § 206.152 (July 1, 2003).  In other words, in a true arms'-length POP contract, the producer-lessee is obligated to pay royalty only on the percentage of NGL it retains, and not on the percentage kept by the processor as its fee. *See* paragraph (1)(a) of Section 206.152.  This means that if the lessee pays 25% of the NGL as a processing fee, neither the processor nor the lessee pays royalty on that 25% of the NGL.

162.     In contrast, where the POP contracts are made on a non-arms'-length basis (e.g., where the producer-lessee also owns or controls the NGL plant – often via a subsidiary or affiliate), the current MMS regulations provide that royalty cannot be less than the gross proceeds accruing to the lessee for both the residue gas and **all NGL products** – less the **reasonable, actual** costs of processing (not a legal deduction under some controlling lease terms).  30 CFR § 206.153.  Thus, under this current regulation applicable to "processed" gas, the producer-lessee must pay royalty even on NGL product retained by the processor.

163.     In addition, where the lessee's gas is processed by it or by its affiliate (whether or not a "marketing" affiliate as defined in these regulations), and, after processing, the residue gas is not sold under an "arms'-length" contract, current regulations require the lessee engage in "dual accounting."  The "dual accounting" is to insure that the gas is valued for royalty purposes at the greater of (1) the combined value, for royalty purposes of the residue gas and all NGL and

all downstream condensate, or (2) the value of the wetstream gas prior to processing (i.e., the "BTU" value of the gas). 30 CFR § 206.155.[3]

### Variable Ownership Straddle Plant Ownership Agreements

164.    As stated above, it generally has been much more profitable to extract NGL and sell them and downstream condensate and the residue gas separately, rather than to sell the wetstream gas on a BTU basis as unprocessed gas.

165.    The current MMS gas royalty regulations provide that when gas is processed and NGL are extracted, a federal lessee is obligated to pay royalty on both the dry, residue gas and all NGL produced from that gas – except in the case of an arms'-length sale by the lessee prior to processing where the NGL are not retained by the lessee.  30 CFR §206.153(a) (July 1, 2003)

166.    To qualify as an arms'-length sale, the contract must have "been arrived at in the marketplace between independent, non-affiliated persons with opposing economic interests regarding that [particular] contract." 30 CFR § 206.151.

167.    As detailed below, a POP processing agreement between a producer-lessee and an NGL plant in which the producer-lessee or its affiliate owns a variable plant ownership interest does not qualify as an arm's-length contract.  Consequently, in this situation, the producer-lessee legally must report and pay royalties on **100%** of the NGL and residue gas attributable to the producer-lessee's interest in plant output – **not** just the "percentage of proceeds" retained by it in the POP processing contract with the NGL plant. Both such retained percentage and the remaining percentage accruing to the producer-lessee or its affiliate as a plant owner by virtue of

---

[3] These complexities do not invade with respect to production from OCS leases issued before March 1, 1988 subject to the 1979 MMS regulations or any production prior to March 1, 1988. "When gas is processed," royalty is computed on the basis of the higher of market value or gross proceeds of all residue gas, all NGL and all downstream condensate. Depending on the particular lease terms  - whether or not they require that royalties be calculated on not less than "gross" proceeds – deductions for actual processing costs may or may not be deductible from royalty obligations.

the variable plant ownership agreement must be included in computation and payment of royalties.

168. Each of the following Defendants or its affiliate is a federal producer-lessee of OCS gas producing properties in the Gulf of Mexico OCS, and owns or has owned, either itself or through an affiliate, interests in the NGL processing plants set forth below opposite its name:

- BP Amoco: Blue Water, Calumet, North Terrebonne, Toca, Sea Robin, and Yscloskey;
- Texaco: Blue Water, Patterson, Calumet, North Terrebonne, Toca, Grand Chenier, Yscloskey, and Sea Robin;
- CNG: Blue Water;
- Shell: Calumet, North Terrebonne, Blue Water, Toca, Iowa, Sea Robin and Yscloskey;
- Chevron: Calumet, North Terrebone, Toca, Iowa, Grand Chenier and Yscloskey;
- UPRG: Patterson and Calumet;
- ARCO and Vastar: Calumet, Grand Chenier and Yscloskey;
- Exxon: Calumet, Toca, Iowa and Yscloskey;
- Mobil: Calumet, North Terrebonne, Toca, Grand Chenier, Iowa and Yscloskey;
- Conoco: Calumet, North Terrebonne, Toca, Grand Chenier, and Yscloskey;
- Phillips: North Terrebonne, Toca and Yscloskey;
- Marathon: North Terrebonne;
- Unocal: North Terrebonne and Yscloskey;
- Devon: Sea Robin;
- OXY: Yscloskey;
- Oryx (now Kerr-McGee) : Yscloskey; and
- Total Fina: Yscloskey and North Tennessee.

169. In addition to the plants in Louisiana named above, Defendants own or have owned interests in other OCS NGL straddle plants in other states bordering the Gulf of Mexico with respect to which  frauds and false statements herein alleged also have been perpetrated. Defendant Dynegy has operated a number of the OCS NGL straddle plants named above, and has conspired with Defendants named above to underpay their royalties owed to the federal government.  In furtherance of such frauds and conspiracies, Dynegy has filed with the government false Form MMS-4056 (Gas Plant Operation Report) reports and false MMS-4058 (Production Allocation Schedule Report) reports with the Government, as have other Defendants.

170.    The NGL straddle plants named above and others process huge quantities of OCS gas produced by Defendants.  These plants are jointly owned by federal lessees and/or their affiliates pursuant to what are commonly called in the industry "construction and operation" (or "C&O") agreements and other agreements providing for the ownership (as well as construction and operation) of the NGL plants.

171.    A plant ownership agreement that provides for ownership interests among the various owner parties to vary periodically (often yearly) according to the relative percentages of gas and/or NGL of each owner that have been processed through the plant (the gas "throughput') during the period is a "variable ownership" plant agreement.[4]

172.    These variable ownership plant agreements may serve three purposes:  (1) they can assure that each co-owner will participate in plant revenues in proportion to the extent each co-owner has contributed to such profits by processing its own gas production in the plant; (2) they  allow the lessee-plant co-owners to share actual processing costs; and (3) **they provide a scheme by which, in combination with POP contracts, the co-owners attempt to insulate NGL production from federal royalty obligations.**

173.    Louisiana straddle plants that either now have, or have had in the past, variable ownership agreements include Calumet, Grand Chenier, Yscloskey, Sea Robin, Blue Water, Iowa, North Terrebonne and Patterson.

174.    Because the ownership shares in these variably owned NGL plants are tied to the percentages of total plant throughput each federal lessee-plant owner processes through the plant, the interests vary periodically to reflect the lessee's varying production processed at the plant.

---

[4] In a variation of the "variable ownership" plant agreement which accomplishes the same basic purposes, ownership percentages are fixed.  But the C&O agreement requires the lessee-plant co-owner to process a minimum quantity of gas through the plant.  This insures that its plant ownership interest does not exceed its proportionate part of total

Thus, for example, if in one year 12% of the gas moving through the plant (the "throughput") belongs to Producer X, then 12% of the ownership interest in the plant is allocated to Producer X. Although Producer X receives only 12% of the plant's total revenues, it receives **100% of its own throughput.**

175.    Defendants that co-own plants processing wetstream gas production on a variable ownership basis **contract with themselves** when they enter into POP processing agreements.[5]  In substance, these Defendants agreed under the POP contract to pay themselves as plant co-owners a percentage of the proceeds generated from the NGL production attributable to them as producers in an attempt to avoid their federal royalty payment.[6]

176.    This arrangement is directly contrary to current  MMS regulations requiring that, in non-arms'-length transactions, royalty must be paid on 100% of the value of the lessee's NGLs. This arrangement also serves to violate the 1979 MMS regulations requiring payment of royalties on all NGL production regardless of who does the processing.

177.    The lessee-plant co-owners in this situation also must value their NGL production according to the "dual accounting" requirement that royalty must be paid on the greater of the value of the unprocessed gas and the combined value of the residue gas, all NGL and all downstream condensate. 30 CFR § 206.155.

---

plant capacity and/or actual gas throughput.  Such other agreements are "variable ownership" agreements for purposes of this Complaint.
[5]  Assuming that X had a 50%-50% POP processing agreement with the plant, then X received 50% of the proceeds of its NGL production as  lessee-producer, and the other 50% as a plant co-owner receiving 100% of the plant revenues attributable to its own throughput.

[6]  In fact, the plant co-owners – who are also federal producers-lessees – have conspired among themselves (and with the plant operators if not one of the producers) to allocate a higher percentage of the NGL proceeds to themselves as plant co-owners, and less to themselves as lessee-producers,  in order to insulate fraudulently their plant ownership percentages from federal royalty payment.

178.   During the period covered by this action, the value of processed gas plus NGL plus downstream condensate was usually greater than the value of unprocessed gas (except in periods of abnormally low oil prices or abnormally high gas/NGL prices).  Thus, in non-arms'-length transactions such as these, where dual accounting is required, the defendant-lessees should have paid – but did not – a royalty based on the combined value of all the processed residue gas plus all the NGL, rather than on the unprocessed wetstream value of the gas or just the percentage of proceeds allocated to them as producer-lessees in their POP processing contracts with the plants.

179.   In these POP-variable plant ownership situations, however, Defendants have failed to report and pay royalty on NGL revenues they received as plant co-owners.  Instead, they improperly underpaid royalty based at most only on those NGL proceeds allocated back to the lease under the non-arms'-length POP contracts, or on the lesser value of the wet gas as such.

180.   For example, in 1992 the Yscloskey plant's POP contracts with the producer-lessees allocated approximately 45% of the NGL proceeds to the plant as a processing fee.  Thus, the lessee-plant co-owner would receive back 55% of the NGL recovered and would pay a royalty only on that 55%.  The same lessee (as a plant co-owner of this straddle plant) would also receive back the remaining 45% of the NGL attributable to its throughput under the variable ownership plant agreement -- minus a small amount for actual processing costs, amounting to less than 2 cents per gallon – and would pay no royalty on these "plant ownership" NGL.  As a result, 45% of the more than 300 million gallons of NGL processed each year at the Yscloskey plant have been falsely and fraudulently concealed from federal royalty obligation.

181.   Any contractual arrangement between a federal lessee and a NGL plant where the lessee's ownership interest actually reflects its total throughput (regardless of the percentage of

the overall throughput that production throughput represents) can never be an arms'-length contract in that the lessee is agreeing to pay itself all or substantially all of the "profits" attributable to the processing of its lease production run through the plant.

182. In any situation in which, regardless of the type of ownership agreement, a particular co-owner owns a sufficiently large undivided interest in the plant that it receives – as a plant owner, not just as a producer – at least a percentage of the plant-kept proceeds as high as the percentage that its production represents of total plant throughput, that contract cannot be arm's-length. That producer is contracting with himself as plant owner and is receiving 100% (or more) of all its lease production of NGL.

183. Such POP processing contracts and other contracts of similar effect between a lessee and a processing plant where the lessee receives 100% of the net revenues from the NGL produced attributable to the amount of its lease production processed at the plant – whether by virtue of a plant variable ownership agreement or other agreement with similar effect – cannot be an arms'-length contract. Thus, the lessee must pay royalty on the greater of the value of the unprocessed gas or the value of all the residue gas, NGL and downstream condensate.

184. The POP arrangements vary from plant to plant and from time to time. But there are instances in which the percentage split has been as much as 50% to the plant. This is egregiously fraudulent when the actual processing costs are less than two cents per gallon and some of the NGL products command more than fifty cents per gallon at times.

185. This claim is not confined to federal OCS production, but includes all federal onshore and Indian (both tribal and allotted) where these frauds have been perpetrated.

186. Substantially all NGL produced from federal and Indian lands by defendants BP-Amoco, Exxon, Shell, Texaco, Oxy, Mobil, Chevron, Conoco, UPRG, Marathon, Unocal and

Oryx have been processed on a non-arms'-length basis. But much if not all of such production has been reported falsely on an arms'-length basis, with huge avoidance and reduction of legally required royalty payments.

## VIII.
## DEFENDANTS HAVE ENGAGED IN DIFFERENT FRAUDULENT SCHEMES TO UNDERPAY ROYALTIES OWED TO THE FEDERAL GOVERNMENT ON NGL PRODUCTION, BY REPORTING AS UNPROCESSED, GAS THAT ACTUALLY WAS PROCESSED.

A.     **Defendants Have Made Fraudulent Claims That Gas Was "Unprocessed" Gas Under Their Interpretation Of The 1988 MMS Regulations When They Knew Such Gas Was Not Subject To Such Regulations But Was Subject To Earlier And Different Regulations.**

187.     Some OCS leases contain express provisions that they are subject only to regulations issued under OCSLA in existence on the effective date of the leases. These leases are not subject to federal royalty valuation regulations issued under OCSLA after the effective dates of such leases. This claim relates only to gas produced from such leases.

188.     All Defendants are, both in law and in fact, familiar with and know the terms of their own leases and the effect of such terms. All Defendants knew that the production of gas from their leases containing such restrictive provision with respect to regulations in existence on the effective date of the leases were subject only to the gas royalty valuation regulations in existence upon the effective dates of such leases.

189.     As such, Defendants have knowingly engaged in a fraudulent scheme of reporting gas produced from these OCS leases containing this restrictive provision, and issued prior to the March 1, 1988 effective date of the 1988 MMS royalty regulations, as if such gas were produced from leases issued after, and subject to, the 1988 regulations and could be reported as "unprocessed" gas under Defendants' construction of the 1988 regulations.

190.    By this fraudulent scheme, Defendants have reported and paid royalties only on the claimed wetstream value of allegedly "unprocessed" gas on a BTU basis, and not on the higher and legally required combined value of the NGL, the residue gas and all downstream condensate.

191.    All Defendants have knowingly engaged in this fraudulent practice with respect to all of their pre-1988 OCS leases and any other pre-1988 federal or Indian leases containing such restriction.

**B.    Defendants Fraudulently Have Reported and Paid Royalties On Gas as "Unprocessed "Gas That Was Processed By An Affiliate Of The Lessee.**

192.    This different claim relates to and covers only the gas produced from federal or Indian leases that <u>is in fact and law subject to the March 1, 1988 MMS gas royalty valuation regulations </u>(including amendments).

193.    Section 206.152 of the current MMS gas royalty regulations is entitled **"Valuation Standards unprocessed gas."** Paragraph (a)(1) of that section provides:

> "(a)(1)  This section applies to the valuation of all gas that is not processed and all gas that is processed but is sold or otherwise disposed of by the lessee pursuant to an arm's-length contract prior to processing (**including all gas where the lessee's arm's-length contract for the sale of that gas prior to processing provides for the value to be determined on the basis of a percentage of the purchaser's proceeds resulting from processing the gas).**  This section also applies to processed gas that must be valued prior to processing in accordance with § 206.153.  **Where the lessee's contract includes a reservation of the right to process the gas and the lessee exercises that right, § 206.153 of this subpart** [i.e., the section relating to "processed" gas] **shall apply instead of this section."** (emphasis added)

194.    Defendants have entered into contracts for the sale of gas produced from their federal or Indian leases, both on arm's-length and non-arm's length bases, whereby they have included a "reservation of the right to process the gas."  All direct sales by Defendants to end users of gas – who have no use for the NGL and no facilities to extract them – contain such

provisions. Most contracts to pipeline purchasers that in turn sell to such end users also have had provisions reserving to the lessee-producer-seller "a reservation of the right to process the gas."

195. The above-quoted regulation requires that gas be reported as processed gas if the sales contract includes a reservation of the right to process "**and the lessee** exercises that right."

196. In order to attempt to evade this provision, and pay royalties on the lower "unprocessed" basis, Defendants have arranged for the processing of the gas to be done, not by the **lessee** (which may be either the parent corporation or an "exploration and production" ("E&P") subsidiary), but by some **affiliate** of the **lessee** – either a "marketing" affiliate or some different affiliate.

197. This is a conscious, knowing, intentional fraudulent "gaming of the system" and a violation of the MMS regulations that were designed and intended to prevent the avoidance of royalty obligations through the subterfuge of affiliates – as shown in part by the expansive definition of "affiliate" in 30 CFR § 206.150.

198. This scheme of processing gas through affiliates of the federal lessee to evade royalty obligations is by definition fraudulent in that the requirements in both federal leases and federal regulations provide that "under no circumstances shall the value of production for royalty purposes be less than the **gross proceeds accruing to the lessee for lease production.**" *See, e.g.,* Section 206.152(h). Defendants all have adopted accounting principles and practices whereby the gross proceeds and profits of the NGL processing affiliates are included in the revenues and profits of the parent corporation along with those of the E&P affiliates that may actually hold title to the federal leases involved, all of the "gross proceeds" of the NGL production have been "**accrued**" to the lessee by the Defendants themselves.

199.    Each defendant has engaged in this fraudulent scheme on various of its federal and/or Indian leases by falsely reporting, on its monthly MMS-2014 report, gas under Product Code 04 ("wet, unprocessed gas") which in truth is "processed" gas (Product Code 03), and by not including the values of the unreported NGL under the items in the MMS-2014 report for "sales quantity," "sales value," "royalty quantity" and "royalty value."

200.    Thus, each Defendant has made five (5) false statements each month with respect to each of its federal leases on those leases as to which this scheme has been perpetrated. Each of these false statements has been made to conceal, avoid or reduce the Defendants' obligations to pay or transmit money to the government.

201.    One or more of Defendants have perpetrated this fraud even in instances where the NGL have been recovered by the same corporate entity that is the actual "lessee" and title holder of the federal or Indian lease. This includes Exxon, which has operated through divisions that are not separate entities, such as Exxon Company U.S.A., and has calculated and paid royalties on the basis of internal transfer prices that do not even involve separate corporate entities.